## RECORD NO. 12-1300

### In The
# United States Court Of Appeals
## For The Fourth Circuit

# ANNE MERCER,

*Plaintiff – Appellant,*

v.

# DROHAN MANAGEMENT GROUP, INC.,

*Defendant – Appellee.*

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA AT ALEXANDRIA

———————————

## BRIEF OF APPELLANT

———————————

Patricia A. Smith
LAW OFFICES OF
 PATRICIA A. SMITH
500 Montgomery Street, Suite 400
Alexandria, VA 22314
(703) 548-3774

Dale Edwin Sanders
ATTORNEY AT LAW
218 N. Lee Street
Alexandria, VA 22314
(703) 837-1650

*Counsel for Appellant*

*Counsel for Appellant*

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
## DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Only one form needs to be completed for a party even if the party is represented by more than one attorney.  Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case.  Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.  Counsel has a continuing duty to update this information.

No. _____        Caption: _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_____
(name of party/amicus)

_____

who is _____, makes the following disclosure:
(appellant/appellee/amicus)

1.      Is party/amicus a publicly held corporation or other publicly held entity?      YES      NO

2.      Does party/amicus have any parent corporations?                          YES      NO
        If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                          YES      NO
        If yes, identify all such owners:

- 1 -

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?          YES      NO
If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)      YES      NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?          YES      NO
If yes, identify any trustee and the members of any creditors' committee:

# CERTIFICATE OF SERVICE
**************************

I certify that on _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

_____                    _____
(signature)                                                                  (date)

- 2 -

11/17/2011
SCC

# TABLE OF CONTENTS

**Page:**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

STATEMENT OF THE ISSUES  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

1.     DEFENDANT REGARDED PLAINTIFF AS HAVING A
DISABILITY THAT SUBSTANTIALLY LIMITED HER
ABILITY TO WORK . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

     a.    The Diagnosis and Notice to DMG  . . . . . . . . . . . . . . . . . . . . 4

     b.    DMG's Reaction to the Disclosure of the Disability and
Request for Reasonable Accommodation  . . . . . . . . . . . . . . . 6

     c.    Drohan Interviews and Hires Another Account Executive  . . . 8

     d.    The Termination - Adverse Employment Action . . . . . . . . . . 10

2.     PLAINTIFF WAS MEETING THE LEGITIMATE
PERFORMANCE EXPECTATIONS OF HER EMPLOYER  . . . . 12

3.     DEFENDANT'S STATED REASON FOR TERMINATION IS
UNWORTHY OF BELIEF AND IS A PRETEXT FOR
DISCRIMINATION AND RETALIATION  . . . . . . . . . . . . . . . . . . 17

     a.    The Conference Call with ECA Board . . . . . . . . . . . . . . . . . 17

     b.    Direct Comparators were Not Treated Similarly -
Neither Were Terminated for Client Unhappiness  . . . . . . . . 20

4.     DROHAN LACKS CREDIBILITY AS DEMONSTRATED IN
SWORN TESTIMONY  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

i

SUMMARY OF THE ARGUMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

    Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

    Discussion of the Issues  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

I.    THE TRIAL COURT ERRED IN ITS DECISION ON
    SUMMARY JUDGMENT BY DRAWING INFERENCES IN
    FAVOR OF DEFENDANT AND CREDITING FACTS
    FAVORABLE TO THE MOVING PARTY  . . . . . . . . . . . . . . . . . . 28

    A.    Faulty Conclusions of the Trial Court Favoring
        The Defense Require Reversal . . . . . . . . . . . . . . . . . . . . . . . 32

    B.    There Exist Material Facts in Dispute on the Cause of
        Action  of Wrongful Termination  . . . . . . . . . . . . . . . . . . . . 42

        1.    Mercer Fulfilled the Legitimate Expectations of
            the Employer  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

        2.    Mercer is a Qualified Person with A Disability . . . . . . 45

        3.    The Circumstances establish intentional
            discrimination; DMG's Stated reason for
            termination is a pretext . . . . . . . . . . . . . . . . . . . . . . . 46

II.    CAUSE OF ACTION OF RETALIATION –THE TRIAL
    COURT ERRED IN GRANTING SUMMARY JUDGMENT
    ON GROUNDS THAT WERE NOT RAISED BY THE
    DEFENDANT THEREBY DENYING PLAINTIFF THE
    OPPORTUNITY TO BE HEARD  . . . . . . . . . . . . . . . . . . . . . . . 47

    A.    The Trial Court Erred in Denying the Plaintiff
        an Opportunity to Be Heard . . . . . . . . . . . . . . . . . . . . . . . . 48

    B.    Sufficient Facts Are Produced to Support
        a Prima Facie Case of Retaliation  . . . . . . . . . . . . . . . . . . . 51

1.      The Court's Conclusions Contradict the Facts  . . . . . . 52

2.      Requests for Medical Leave are a Request for
        Accommodation and are Protected Activity  . . . . . . . . 53

3.      The Evidence Establishes the Causal Connection
        Between the Adverse Employment Action and the
        Request for Reasonable Accommodation  . . . . . . . . . 57

C.      The Evidence Establishes Pretext  . . . . . . . . . . . . . . . . . . . . . 57

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**Page(s):**

**Cases:**

Ancel v. International,
      170 F.3d 32 (1st Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Anderson v. Liberty Lobby,
      477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Baucom v. Potter,
      225 F. Supp. 2d 585 (D. Md. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Bennet v. City of Holyoke,
      362 F.3d 1 (1st Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Bergin v. N. Clackaman School District,
      2005 U.S. Dist. Lexis 42252 (D. Or. 2005) . . . . . . . . . . . . . . . . . . . . . . . . 56

Clark Cnty. Sch. Dist. v. Breeden,
      532 U.S. 268 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Corder v. Lucent Techs., Inc.,
      162 F.3d 924 (7th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Duckett v. Dunlop Tire Corp.,
      120 F.3d 1222 (11th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Fleck v. Wilmac Corp.,
      25 Am. Disab. Cases (BNA) 1846 (E.D. Pa. 2011) . . . . . . . . . . . . . . . . . . 55

Gallagher v. Reliance Standard Life Ins. Co.,
      305 F.3d 264 (4th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Gallo v. Prudential Residential Services,
      22 F.3d 1219 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

iv

Garrett v. University of Alabama Birmingham Board of Trustees,
       507 F.3d 1306 (11th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Garza v. Abbott Laboratories,
       940 F. Supp. 1227 (N.D. Ill.1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55-56

Gray v. Spillman,
       925 F.2d 90 (4th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 31

Haulbrook v. Michelin North America, Inc.,
       252 F.3d 696 (4th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Haschmann v. Time Warner Entm't Co.,
       151 F.3d 591 (7th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Hill v. Lockheed Martin Logistics Mgmt,
       354 F.3d 277 (4th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Hormel v. Helvering,
       312 US 552 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Hunt v. Cromartie,
       526 U.S. 541 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Jones v. United Parcel Serv., Inc.,
       502 F.3d 1176 (10th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Krouse v. American Sterilizer,
       126 F.3d 494 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Leeds v. Potter,
       249 F. App'x 442, 2007 U.S. App. Lexis 223517 (6th Cir. 2007) . . . . . . . . 54

Matthews v. Village Center Community Development,
       2006 U.S. Dist. Lexis 85906 (M.D. Fla. 2006) . . . . . . . . . . . . . . . . . . . . . 56

Merritt v. Old Dominion Freight Line, Inc.,
       601 F.3d 289 (4th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 43

Murphy v. United Parcel Serv.,
   527 U.S. 516 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Myers v. Hose,
   50 F.3d 278 (4th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Nassau County v. Arline,
   480 U.S. 273 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Parada v. Banco Industrial de Venezuela,
   2011 U.S. Dist. Lexis 14799 (S.D.N.Y. 2011) . . . . . . . . . . . . . . . . . . . . 52

Price v. Thompson,
   380 F.3d 209 (4th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Reeves v. Sanderson Plumbing Products, Inc.,
   530 U.S. 133 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 43, 45, 46

Rhoads v. FDIC,
   257 F.3d 373 (4th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31, 51

Rhoads v. FDIC,
   286 F. Supp. 532 (D. Md. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 57

Rodgers v. Lehman,
   869 F.2d 253 (4th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Rohan v. Networks Presentations, LLC,
   375 F.3d 266 (4th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 45

Soileau v. Guilford of Maine,
   105 F.3d 12 (1st Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Staub v. Proctor Hospital,
   131 U.S. 1186 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Tinsley v. First Union Nat'l Bank,
   155 F.3d 435 (4th Cir. 1998) (overruled on other grounds) . . . . . . . . . . . 57

Tyndall v. National Educ. Ctrs.,
    31 F.3d 209 (4th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Williams v. Brunswick County Board,
    2011 U.S. App. Lexis 15233, 25 Am. Disabilities Cases (BNA)
    414 (4th Cir. 2011) (unpub.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Wilson v. Phoenix Specialty Manufacturing Company,
    513 F.3d 378 (4th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Works v. Astrue,
    2011 U.S. Dist. Lexis 33152 (D. Md. 2011) . . . . . . . . . . . . . . . . . . . . . . . 56

**Statutes:**

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

42 U.S.C. § 2000e-5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

42 U.S.C. § 12101 et seq . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

42 U.S.C. § 12110(10) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

42 U.S.C. § 12112(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

42 U.S.C. § 12112(b)(5)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

42 U.S.C. § 12102(2) (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

42 U.S.C. § 12102(4)(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

42 U.S.C. § 12203(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

**Rules:**

Fed. R. Civ. P. 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Fed. R. Civ. P. 56(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48, 49

Fed. R. Civ. P. 56(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 49

Fed. R. Evid. 801(d)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

**Regulations:**

29 C.F.R. Pt. 1630.2(j)(1)(vii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

29 C.F.R. Pt. 1630.2(o) App . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

29 C.F.R. Pt. 1630 Intro., 76 Fed. Reg. 16978, 17004 (March 25, 2011), citing 2008 House Judiciary Committee Report at 5 . . . . . . . . . . . . . . . . . . . . . . 29

**Other:**

Pub. L. 110-325 Section 2(b)(3), September 25, 2008 . . . . . . . . . . . . . . . . . . . . . 29

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

Jurisdiction was appropriate in the trial court pursuant to 28 U.S.C. § 1331, and the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq and 42 U.S.C. § 2000e-5.

Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1291.

The trial court issued its final judgment disposing of all claims and parties on November 28, 2011.  JA 152, 167.  Plaintiff filed a Rule 59(e) motion to alter or amend the judgment on December 26, 2011.  The trial court issued its Order denying the motion on February 21, 2012, JA 168, and the Plaintiff filed her Notice of Appeal on March 5, 2012.  JA 169.

## STATEMENT OF THE ISSUES

1.    Whether the trial court's decision on summary judgment was contrary to law and fact, and the result of drawing inferences and making credibility determinations favorable to the defense.

2.    Whether the trial court erred in rendering summary judgment for defendant on grounds not raised by the defendant and without providing the Plaintiff meaningful opportunity to be heard or present evidence.

3.    Whether the trial court erred in denying Plaintiff's Rule 59(e) motion.

## STATEMENT OF THE CASE

Plaintiff Anne Mercer brought a cause of action against her former employer, Drohan Management Group, for disability discrimination under the ADA, 42 U.S.C. 12101, et seq.  JA 16.  The cause of action alleged that Defendant

1

regarded Plaintiff as an individual with a disability and that she was wrongfully

terminated, that Defendant failed to provide her reasonable accommodation, and

that Defendant retaliated against her because of her request for reasonable

accommodation.  Plaintiff's employment was terminated a mere 10 days after she

informed her employer that she had been diagnosed with endometrial cancer, that

she required surgery and needed some time off work for the surgery and

recuperation.

       After discovery, Defendant filed a Motion for Summary Judgment on July

25, 2011, a corrected version of which was filed on July 28, 2011.  JA 24.

Plaintiff filed her opposition on August 9, 2011.  JA 61.  A hearing on the motion

was held September 9, 2011.  JA 111.  The trial court granted the motion and

issued a memorandum opinion and final judgment on November 28, 2011.  JA

152, 167.  Thereafter Plaintiff filed a Motion to Alter or Amend the Judgment on

December 26, 2011.  The Court denied the motion by a one-paragraph Order on

February 21, 2012.  JA 168.  This appeal followed.  The Notice of Appeal was

filed on March 5, 2012.  JA 169.

## STATEMENT OF FACTS

       Drohan Management Group (hereinafter "DMG") provides association

management services to small and medium sized associations.  JA 153.  William

Drohan is the President of DMG .  Id.  Plaintiff was hired by DMG to serve in

the capacity of executive director for its client associations.  Id.  She initially held

an administrative position and after a 90 day probation was promoted to the

Account Executive position.  JA 233; complaint and answer ¶ 8 JA 17, 28.  At the

time of her hire, Plaintiff had 30 years of experience in all aspects of association

management, a bachelor of arts degree, a master's degree, and a certificate of

finance administration from the American Society of Association Executives.  JA

181, 184.  The Employment Contract between the parties stated that plaintiff

would receive "benefits such as vacations, sick leave and insurance coverage, if

any, [that] may be offered . . . in Employer's sole discretion pursuant to the

personnel manual as it may be revised by Employer . . .."[1]  JA 194 ¶  4.  Plaintiff

reported to William Drohan and to Cathy Vail, the Director of Operations.

---

[1]    The trial court found that this employment agreement did not
"contain restrictions as to any employee benefits including vacation and sick
leave."  JA 154.  This finding is clearly erroneous, and is the result of the Court
having made findings and conclusions based upon matters not briefed or otherwise
addressed by the parties.  As argued in the Plaintiff's Rule 59(e) motion, the
Defendant's DMG Policy Manual 2005, JA 220, details the requirements and
procedures which an employee must follow to obtain consent in advance for use of
leave, which include, for an extended medical leave, one year of service (which
Mercer did not have).  The DMG Policy Manual is incorporated by reference in
paragraph 4 of the Employment Agreement, ". . . benefits . . . may be offered . . .
pursuant to the personnel manual as it may be revised by Employer from time to
time."  JA 196

Plaintiff served as the executive director to the Express Carriers Association ("ECA"), the National Association of State and Local Equity Funds ("NASLEF"), the American Association of Medical Dosimetrists (AAMD"), and the Society for Innovative Medical Practice Design (SIMPD"). JA 154. Mercer was responsible for overall staff functions for each association, membership, conferences, publications, and marketing, working with the members of the governing board of each association. Id.

Plaintiff had only 2 new employees to serve as her support staff; neither had any experience in association management, and one served part-time as receptionist. JA 274. For the ½ time receptionist this was her first "real" job out of college. JA 341. Drohan testified that their business was enormously deadline driven. JA 470-471. The deadlines were particularly crucial with annual conferences, and in April 2008, Plaintiff's largest client, ECA, was scheduled to hold its annual meeting. JA 155.

## 1.    Defendant Regarded Plaintiff as Having a Disability that Substantially Limited Her Ability to Work

### a.    The Diagnosis and Notice to DMG

On February 11, 2008, in an office visit with her doctor to receive the results of a biopsy, Plaintiff was informed that she had endometrial cancer and would need a surgery immediately in order to prevent metastasis:

> She [the doctor] was very professional. She told me what the diagnosis was, it was early stages and that I needed an operation, a hysterectomy, right away to keep it from spreading, . . . And we talked about whether I would need chemotherapy or radiation **and she said she wouldn't know until after the surgery itself.** It would depend on what they found in the surgery so that was up in the air, and I asked her if I could wait until after the ECA meeting in the middle of April and she said absolutely not.

JA 256 (emphasis added). During that appointment, the surgery was scheduled for March 5, 2008. Id. Plaintiff was advised that with the immediate surgery, the prognosis for recovery was good. JA 256-257. Plaintiff told the doctor that she had only three weeks leave accrued and would plan to return to work at the end of that period. Her doctor told Plaintiff that she preferred a six week recovery period before returning to work, and said that she should be careful. JA 257.

Plaintiff reported to work after the early morning doctor's appointment, and immediately advised Cathy Vail of her diagnosis of endometrial cancer, the need for surgery, the type of surgery, the scheduled date of March 5, her intent to use all of her leave of 3 weeks, and her plans to return to work March 26. JA 261. Plaintiff expressed concern about the upcoming ECA annual meeting and asked Vail how they planned to handle it. Vail merely offered to schedule an appointment with Drohan. Id.

5

Later that same day, plaintiff advised William Drohan of her diagnosis of endometrial cancer, the need for a hysterectomy, and that the surgery had to take place as soon as possible. She told him of the scheduled date of March 5, 2008, her intent to use her 3 weeks leave and to return to work March 26. She explained again her concerns about the upcoming ECA meeting (2 months hence) and the doctor's refusal to allow her to delay the surgery until after the ECA meeting. JA 261.

### b.  DMG's Reaction to the Disclosure of the Disability and Request for Reasonable Accommodation

Drohan's immediate reaction to the cancer diagnosis and surgery was to ask whether plaintiff would need chemotherapy and/or radiation. Plaintiff testified:

> I told him that I had been diagnosed with endometrial cancer and that surgery had to take place as soon as possible . . .
>
> Well, he asked me about the chemotherapy and radiation and I told him what the doctor had told me, which was that they wouldn't know if I would need that until after the surgery. They didn't feel it was highly likely, but there was a possibility and it depends if there had been any spreading of the cancer, but they were hopeful that there hadn't been.

JA 261, 282. The inference from Drohan's question is that he believed plaintiff would be substantially impaired over a long period for treatments for cancer and that the impairments would greatly interfere with Plaintiff's ability to work.

Drohan told Plaintiff to keep her diagnosis and need for time off a secret, and not to disclose it to coworkers or clients, until a plan was devised to respond to her scheduled absence.  JA 261.

Drohan also told plaintiff that his wife had a similar problem and urged plaintiff to obtain a second opinion from his wife's physician. Drohan gave plaintiff the contact information for his wife's physician.  JA 262-263.

Drohan met with Plaintiff and her staff the next day, February 12th, for the weekly staff meeting.  Plaintiff expected Drohan to mention her upcoming leave of absence and his plan for it, but it was not mentioned.[2]  After that February 12, 2008, meeting, Drohan's attitude towards Plaintiff changed.  JA 189 (# 12).  One week later when Plaintiff requested additional staff assistance, Drohan responded dismissively that he would not provide her more staff resources, that she had all the help that she needed. JA 189 (# 12)  Otherwise, it was the silent treatment, in a small office where interaction was the norm.  Id.  Drohan never again spoke to her until the meeting in which she was terminated.  Id.

_____

[2]    In anticipation of her absence being mentioned at the meeting, plaintiff revealed her diagnosis, surgery date, and need for 3 weeks recuperation to her support staff.  Despite Drohan's instruction, Plaintiff believed it was important for her support staff to know in advance of the weekly staff meeting, which was scheduled that day. JA 265-266.

7

### c.    Drohan Interviews and Hires Another Account Executive

Immediately after Plaintiff advised DMG of her cancer diagnosis Drohan began interviewing candidates for the Account Executive position, the same position held by the Plaintiff.  Id.  Ordinarily, such interviews would be conducted if Drohan were getting in some new clients, but Mercer knew of none.[3]  Plaintiff testified that she knew candidates were being interviewed and was told they were interviewing to be an account executive.  She stated

> I was not aware of any new clients . . . in anticipation of a new client, he might have been hiring somebody, but I don't know if he was.

JA 285.

On the weekend of February 16, 2008, a mere five days after plaintiff's disclosure of her diagnosis to DMG, Drohan interviewed Peter Doherty for the position of account executive at a location outside the office.[4]  JA 317, 319.

---

[3]    The trial court concluded that Mercer "acknowledged" that interviews for new account executives would be conducted even if she had stayed in her job. JA 157.  No such acknowledgment was made.  Moreover, Defendant produced no evidence that it brought in any new clients in that time frame or that the interviews were conducted for that purpose.

[4]    Doherty testified that he could not remember the exact date of the interview, but that he did remember that it was a weekend in February.  JA 317, 319.  He testified that when he accepted the position he was able to give  "full" (presumably 2 weeks) notice to his then employer of his intended start date of March 4, 2008. JA 321.  Drohan did not recall whether the interview date was a Saturday, but did recall it was not at his office.  JA 420-421.

When Drohan offered Doherty the job, Drohan told him that the position was "becoming available", but was not currently open.  JA 320.  Drohan told Doherty that the job would have a primary focus on Plaintiff's ECA account and the upcoming ECA meeting, with major deadlines looming in the future.  Drohan told Doherty that he would be assisted by Cathy Vail in preparing for the April ECA meeting. JA 325, 422.

Doherty accepted the job on Tuesday, February 19 (only two days before the Plaintiff was terminated), and gave his employer full notice of his intent to leave effective March 4, 2008.  JA 321.[5]

Drohan admits that Peter Doherty  accepted Drohan's offer of employment before he terminated Anne Mercer on February 21, 2008.  JA 423.

Doherty took over Plaintiff's ECA account when he moved into plaintiff's office on March 4, 2008.  JA 328, 331.

---

[5]        This date of February 19 is extrapolated from known facts: (1) Doherty's start date of employment was March 4th (JA 321); (2) Doherty accepted the offer 3 days after the weekend meeting (id.); (3) Doherty intended to give "full notice" to his employer because he did not want to "leave anyone in the lurch at my current position" (id.); and (4) Monday, February 18, 2008 was a federal holiday, President's Day, so the next opportunity to give his employer "full notice" would be February 19th.

9

### d.    The Termination - Adverse Employment Action

The day before the Plaintiff's termination, she was scheduled to be at the ECA Board meeting by telephone conference.  JA 156.  Vail was also on the telephone conference call and managed to take 13 pages of notes of a 65 minute meeting, JA 400, even though it was Plaintiff's responsibility to take the notes and draft the minutes.  Vail admitted that the purpose of taking the notes was to document a record for the future, JA 403, 408, and kept them in case we get to a situation like this, i.e., litigation.  JA 411.  See infra section 3.a.  The inference from this evidence and the fact that Drohan discussed the Plaintiff's termination with Vail in advance, is that the decision to terminate had already been made before the telephone conference call on February 20th (if not on the 19th when Doherty accepted the position).  Whatever occurred in the telephone conference was irrelevant; the decision to terminate had already been made.

Plaintiff was terminated on February 21, 2007, in a meeting with Drohan, Vail and Wendy Shields, an office administrator.  JA 157.  During the meeting, Drohan told Plaintiff that she was providing insufficient leadership and was not doing a good job.[6]  JA 157.  Plaintiff asked more specifically what she was doing wrong, and Drohan declined to respond, simply saying "things were not working out" and

---

[6]    Actually, Drohan testified that he could not recall ever having had an occasion to criticize Plaintiff's performance whether in public or in private.  JA 432.

10

that there had been clients' complaints but refused to identify the clients and refused to identify the complaints. JA 289-290. During that meeting, Plaintiff asked about her health insurance and referred to her "cancer;" Drohan told her that she could pay for COBRA. JA 289-290. When Plaintiff asked that Drohan not prevent her from obtaining unemployment compensation, she was warned by Vail that "if you can't work, you can't apply for unemployment compensation."[7] Id. at 290, 190. Drohan was silent in response to this comment. Also at that meeting, Plaintiff was reminded to keep her diagnosis a secret from clients and employees.[8] JA 190.

The termination came as a complete surprise to Plaintiff:

> I had no warnings that my job was inferior, no one told me a client was unhappy with my work, and there was no malfeasance on my part. In fact, all verbal comments made to me by Drohan up until February 11, 2008 had been nothing but positive. If I had been doing a poor job before February 11, 2008, there wold have been meetings to inform me of this and written documents to explain in what areas I needed to improve. There were no meetings and there were no documents. I did not have a review with Drohan at 3 or 6 months but expected one at 12 months . . . Therefore I must conclude that the reason I was fired was due to my request for reasonable accommodation.

JA 190-191.

---

[7] Drohan had discussed the termination with Vail in advance of the termination meeting. JA 357.

[8] The trial court found that no mention of the Plaintiff's medical condition was mentioned as a reason for termination. JA 162. Only the most foolish of defendants would ever make such a statement.

## 2.    PLAINTIFF WAS MEETING THE LEGITIMATE PERFORMANCE EXPECTATIONS OF HER EMPLOYER[9]

Plaintiff was considered a soft-spoken, pleasant individual.  She was a "friendly person to work with."  JA 427.  Mercer was "nice," "pleasant," "kept to herself."  JA 388.

There exists no documentation to support DMG's contention of poor performance by Plaintiff – no counseling, no reprimands, no mention of a performance deficiency.  Defendant admitted that it did not memorialize any performance deficiency issue related to plaintiff in written or electronic form.  JA 203.

In fact, Drohan testified that he could not recall ever having had an occasion to criticize Plaintiff's performance whether in public or in private.  JA 432.

Drohan also testified that he could not recall ever helping Plaintiff try to improve her performance or ever warning her that if she did not improve her performance she would be fired.  He testified that he could not recall if anybody at DMG ever warned Plaintiff that if she did not improve her performance she would be fired.  JA 443.

---

[9]    The defense relied upon inadmissible hearsay statements of a former ECA president who is deceased.  Plaintiff objected to the inclusion of the inadmissible hearsay.  JA 82 and Second Motion in limine to Preclude Evidence at Trial of Hearsay Statements by Carrie Ehlers, filed August 22, 2011, Docket # 82.  The trial court stated it was not addressing the issue of admissibility, JA153 note 2.  Only admissible evidence may be considered on summary judgment.

Prior to her termination, plaintiff had never been told by DMG of any performance deficiency. JA 189-190, 295. Nor had Plaintiff ever been advised of any performance deficiency during her tenure at DMG by any client. JA 189-190, 295.

Instead, Plaintiff was repeatedly commended for her work performance by president William Drohan and as late as February 12, 2008[10]. JA 189-190, 295, 302-303.

Vail admits that Drohan complimented her: "Keep up the good work; your [sic] doing a good job." "I knew he complimented her." JA 373.

SIMPD (Society for Innovative Medical Practice Design) was Plaintiff's first client and was assigned to her in the summer of 2007. She worked closely with its president, Dr. Ewin in preparation for the December, 2007 Arlington, Virginia Annual Board of Directors Meeting and medical conference. JA 239-240. SIMPD was fired in December 2007 as a DMG client by Drohan due to

---

[10]     During the weekly meeting on February 12, 2008, in the presence of Plaintiff's staff, Drohan complimented Plaintiff on the manner in which she had conducted a recent Board meeting for their client NASLEF, which Drohan also attended. Drohan stated that she "had organized the committees very well because committee redevelopment was one of their major tasks at this Board meeting." JA 294, 189 (# 12). Delores See, one of Plaintiff's employees, was present at that meeting and testified, "at that point in time he was very happy with her." JA 302. Drohan "praised the work Anne did" at the Florida meeting with NASLEF, id.,and said that the meeting "went very well." JA 303.

Drohan's concern about its ability to pay the monthly fees. JA 243.  Even though

SIMPD was understandably disappointed with DMG as an organization, its

president spoke high praise of his impression of the quality of Plaintiff's

performance:

> It was outstanding.  She was professional.  She was
> direct.  She was always available, always responsive.
> She always had great follow up and she always would,
> you know, a lot of times give me ideas that I would not
> even think of.  It was everything that I expected out of an
> executive director.  It was what I needed.

JA 552.  The president went on to describe Mercer as "organized," "proactive," "in

terms of level of professionalism she was very professional, very soft-spoken but I

could tell she was well educated and that she had done this before."  J A 553.  Dr.

Ewin testified that he had no problems working with Anne, but he did have

problems with DMG because he never received a financial statement or profit and

loss statement.[11]  JA 551, 553-554, 241-242.

---

[11]     Glen Beales, the top financial person at DMG, was responsible for
providing profit and loss statements for the client associations.  JA 251.  Mercer
was unable to obtain financial statements for SIMPD from Beales despite her
efforts to do so.  JA 551.  Mercer testified  "Executive directors at DMG did not
have primary responsibility for budgeting and financial management.  That
responsibility belonged to Glen Beales, the director of finance."  JA 251.  " I did
not handle the budget; my main responsibilities as I said before are to approve
invoices to make sure they were correct.  I would assist Glen Beales when he had
questions about the client's budgets or financial management, but I did not handle
any of it."  Id.

Plaintiff was also held in high regard by some ECA board members who were deposed - John DiTucci and John Storm.

John Storm was an original founding member of ECA and served on its board of directors continuously from its inception in the 1990's until April of 2011.  JA 557-558.  He was a member of the board of directors during the tenure of all 3 Executive Directors who served ECA during its affiliation with DMG (Page, Mercer and Doherty).  Id.  He was totally dissatisfied with Rebecca Page, the first Executive Director.  He was also totally dissatisfied with Plaintiff's successor, Peter Doherty.  JA 561, 569.  However, he was effusive in his praise of Anne Mercer describing her as "cooperative" - "intelligent" - "forthcoming" - "available" - "responsive"-  "always professional", "bright woman", "did a good job."  JA 567-568.  Storm's interaction with Mercer was extensive, once or twice a week in the preparation for the upcoming conference.  JA 564-565.  When asked to compare Anne Mercer to Rebecca Page, Mr. Storm described Plaintiff in this way:

> Yes.  She was much more involved in what we were doing,  much more knowledgeable about the things that we added and very efficient.  She got things done. She scheduled the meetings, together with the programs that we required in an efficient manner… Yes, she was basically what we were looking for. … She was very cooperative.

15

JA 563.  Storm acknowledged ECA was a demanding group with high standards of efficiency and with a very high set of skills.  Their expectations were high. According to Storm, Rebecca Page and Peter Doherty  did not meet those expectations, but  Anne Mercer did meet their demanding standards.  JA 559, 566.

John DiTucci was also a board member with ECA during Anne Mercer's tenure and testified on her behalf.  He said that he never missed a conference call or board of directors meeting and he attended the Florida meeting where Anne Mercer was present.  JA 579.  He was on the conference call of February 20, 2008 which DMG claims to be the catalyst that triggered Mercer's termination.  In sharp contrast to DMG's version of the call, DiTucci  has no recollection of any unprofessional event during that conference call;  nor did he have any recollection at any time of Plaintiff acting in a manner that was other than professional. JA 583.  DiTucci testified that he never had any problems with Anne Mercer and did not observe anything that he would consider to be problematic about her performance.  JA 581.

Each year DMG would send an annual performance evaluation form to each client seeking feedback for the company.  Vail would send the form to the client with a return envelope addressed directly to Drohan.  JA 393.  DMG has not produced one single document with one negative word about Plaintiff.

3.   **DEFENDANT'S STATED REASON FOR TERMINATION IS UNWORTHY OF BELIEF AND IS A PRETEXT FOR DISCRIMINATION AND RETALIATION**

The facts stated above related to Plaintiff meeting the reasonable performance expectations of her employer also support the element of pretext, in addition to the following:

a.    **The Conference Call with ECA Board**

One of the Defendant's many contentions was that the Plaintiff was terminated because of a conference call with the ECA board in which Plaintiff was alleged to have acted unprofessionally.  This is not true because the timeline indicates that Peter Doherty had been hired the day before the call.  What occurred during the conference call could not have influenced her termination since Doherty had already been hired. The conference call with the ECA Board members took place on February 20, 2008. JA 156.  Peter Doherty had been hired the day before to take over the Plaintiff's most pressing deadline and account, ECA.  See note 5 supra and accompanying text.

On February 20, 2008, two of plaintiff's clients were scheduled for Board of Directors meetings via conference calls. Her duties on that day, as with all board meetings,  included taking notes in preparation for the drafting of the minutes of the meetings.  JA 405.   On the morning of the 20th, plaintiff was told by Cathy

17

Vail that she would sit in on both meetings and take notes. JA 280, 405. This was the first time Vail had ever sat in on any of Plaintiff's conference call meetings. JA 280, 405.

**Vail admitted that she took 13 pages of notes in that 65 minute meeting as a record for the future and kept them to defend litigation.** Vail took a total of 13 pages of notes at the 65 minute ECA board meeting on February 20. JA 400, 210(ECA Board Minutes documenting the start and end time of meeting). Vail admitted that the purpose for her own note taking was to create "my minutes.", JA 403-408, 188 #9, to document a record for the future, JA 407, for the purpose of defending litigation, "I guess if we got to a point like this." JA 411. The inference from this evidence is that Vail **knew** at the time of the conference call that Mercer was going to be terminated. Otherwise, there was no reason for her purpose in note-taking to be for a record for the future, kept for defending litigation. This is clear evidence that what occurred in the conference call had nothing to do with the termination – the decision to terminate had been made before the call occurred.

The further inference from the evidence is that Vail attended these board meetings and took copious notes in an effort to obtain any pretext on which to assign fault to the Plaintiff.

Moreover, the fact that DMG kept these internal ECA notes is in sharp contrast to their testimony of destruction of or returning to ECA **all** ECA materials, including internally prepared materials, when ECA terminated DMG's services in January 2010. JA 472, 476.

The board meeting with ECA contained an exchange where Plaintiff responded to some concerns about task completion by stating that she was doing the best she could, but that ECA was not her only client. JA 188, # 9. Plaintiff's tone of voice was even-handed, calm and civil; at no time did anyone raise their voice in the phone call. Id.; JA 277. Plaintiff acknowledged to Vail that she should not have made that statement in the conference call; even though the board of directors knew that she had other clients, they did not want to hear it.[12] JA 188 # 9, JA 277.

_____

[12]    The statement occurred at the end of a long conference call, where plaintiff had been given many assignments to complete in a period of time in which plaintiff knew that she would be recovering from surgery and be away from the office. Plaintiff found the conference call to be extremely stressful, since she had kept her promise not to disclose to any client the planned medical leave of absence, and it was apparent that ECA did not know that she would be unable to complete the tasks which were being assigned to her in the board meeting. JA 276. Despite Drohan's promise to disclose to plaintiff a plan for her leave of absence, to which he had never objected, he failed to do so and no one from the management of DMG ever told plaintiff how her leave of absence would be managed. JA 276-277, 188 # 9.

19

Plaintiff's description of the call was contradicted by Vail. Vail reported the comment to Drohan in an exaggerated manner as "yelling".[13] JA 409, 188 #9. DMG's description of the conference call is exaggerated and contrary to the testimony of a member of the Board of Directors who was on the conference call. In sharp contrast to DMG's version of the call, John DiTucci testified that he had no recollection of any unprofessional event during that conference call; nor did he have any recollection at any time of Plaintiff acting in a manner that was other than professional. JA 583. DiTucci testified that he never had any problems with Anne Mercer and did not observe anything that he would consider to be problematic about her performance. JA 581.

### b.    Direct Comparators Were Not Treated Similarly - Neither Were Terminated for Client Unhappiness

Aside from the evidence in the prior two sections which reveal the stated reasons for termination of "poor performance" and "lack of leadership" are unworthy of belief, further evidence of pretext is apparent from the treatment of persons who were also Account Executives and whose poor performance caused clients to terminate their contracts with DMG, or led to reassignment of the client. Yet, neither person was terminated, despite client unhappiness despite DMG's loss of the clients.

---

[13]    Plaintiff's testimony is that "the tone was businesslike, professional, and civil, with the board doing the majority of the speaking. This was made as a statement of fact and at no time did anyone raise their voice – neither me nor anyone on the Board.."   JA 188 # 9.

20

Anne Mercer served as the Executive Director for four clients during her tenure with DMG: ECA, AAMD, SIMPD, and NASLEF. JA 154. None of these clients fired DMG on Plaintiff's watch. ECA and NASLEF terminated their contracts with DMG during the tenure of Mercer's immediate successors - Peter Doherty and Greg Robinson. JA 439, 328-329.

ECA was a difficult client. JA 154. The board members of ECA, who were owners and presidents of companies in the express delivery or trucking services industry, were very demanding and had little tolerance for those not measuring up to its standards. Id. The group imposed demands and expected immediate results by DMG.[14] JA 438-439, 559, 566.

DMG was hired in the spring of 2007 to serve ECA. Shortly thereafter, the ECA president demanded the removal of the originally assigned Executive Director, Rebecca Page. JA 394, 560-561. All of the ECA board members who were deposed referred to Rebecca Page in negative terms, including several of DMG's own witnesses who called her "horrible" (for example, John Storm, a member of the Board of Directors, JA 560-562, Gilbert, JA 449-450, Westrom JA 456. Page was transferred from the ECA account in the summer of 2007, and

---

[14]     Plaintiff felt there was too much work from ECA and requested more support staff. JA 381. Vail declined to assist her in that regard and advised her to "sink or swim" on her own. Id. 384. Still, Vail never heard one complaint from anyone at ECA about Anne Mercer. JA 382.

replaced by the Plaintiff.  JA 446.  Despite ECA's unhappiness with Rebecca Page, DMG did not fire her.  Page  voluntarily resigned in April 2008.  JA 424.

Peter Doherty succeeded Plaintiff as the Executive Director for ECA while assuming the duties for two other associations as well.  All of Doherty's 3 originally assigned clients fired DMG on his watch.  JA 328-330.  Two of his original clients fired DMG within six months of his arrival.  ECA was not satisfied with Doherty's services and within 18 months of his appointment, ECA terminated the contract with DMG.  JA 569, 328-330.   Despite the obvious dissatisfaction with Doherty from a total of three clients, DMG did not terminate Doherty.  Doherty, a person without a perceived disability,  was still employed with DMG at the time of his deposition in this case.  JA 315.

Doherty was not particularly concerned about his losing clients and testified that "you have problems with everyone." JA 330.   As noted, DMG was not concerned about the problems ECA and other clients had with Doherty, because Doherty was still employed with DMG.  JA 315.

The inference from this evidence of the poor performances of Page and Doherty, neither of whom were terminated and neither of whom had a serious medical condition, is that  DMG's stated reason for Mercer's termination is simply a pretext for disability discrimination and retaliation.

DMG fired another employee after learning she had a medical condition

requiring followup treatment.  Delores See was Plaintiff's only full time support

staff.  She was fired by DMG approximately 9 months after Plaintiff was fired.

Her termination occurred 45 minutes before she was scheduled to leave the office

for a follow up medical appointment.    Cathy Vail knew of her appointment and

knew that it would be a follow up appointment.  JA 304-305.

**4.    DROHAN LACKS CREDIBILITY AS DEMONSTRATED
IN SWORN TESTIMONY**

Drohan committed perjury in his depositions on the subject of what he knew

about Mercer's condition:

> Knew about the surgery:
>
>      At his deposition on May 11, 2011, Drohan
> admitted that he knew about possible surgery: "She had a
> test and it was inconclusive and she may have to have
> elective surgery for a hysterectomy."  JA 418-419.
>
> Did not know about the surgery:
>
>      At his deposition as the Rule 30(b)(6) designee on
> May 17, 2011, Drohan testified that Plaintiff never told
> him she had endometrial cancer, JA 512; that at the time
> the decision to terminate her was made, he had "no
> knowledge of any impending medical condition," JA 510
> (emphasis added); that "we never heard anything from
> her on any of that" JA 513; and that had she made the
> request and disclosed the surgery and diagnosis they
> would have granted that.  JA 513.

Drohan not only contradicts himself on this key issue; but also he is contradicted by Cathy Vail.  Vail testified that she and Drohan discussed Plaintiff's need for surgery when Vail was informed by Drohan of his intent to fire Plaintiff,  "At the time he wanted to let her go, fire her, I said to him, I'm concerned because she might have to have surgery."  JA 357.

In his Interrogatory Answers[15] Drohan stated that he conferred with his executive committee before firing Plaintiff.   JA 209.  The executive committee is comprised of  Rick Guggolz and Glenn Beales.  Id.  Both Guggolz and Beales denied ever consulting with or speaking to William Drohan concerning the proposed termination of Plaintiff.  JA 333-334, 338.

Drohan also lied to his executive committee.  Beales testified that Drohan told him  "he didn't know of the medical condition."

| | |
|---|---|
| Question: | He didn't know of it when he fired her, you mean? |
| Answer: | Right, correct, that's what I meant to say. |

JA 335.

---

[15]    Drohan recertified the accuracy of his interrogatory answer in his deposition.  JA 445.

Q:    Well did he tell you that?"

A:    Well actually he's told us after words, that, you know, its absolutely not true, that he didn't know anything about that.

A:    Me.  The Executive Committee, they didn't even meet about this.

Q:    He has told you recently that he didn't know anything about her-

A:    Right.

Q:    Medical conditions-

A:    Right.

Q:    When he fired her?

A:    Right.

JA 338.

Having committed perjury, Drohan is unbelievable as a witness on any subject.

## SUMMARY OF THE ARGUMENT

The trial court erred in granting summary judgment for the Defendant by drawing inferences favoring the Defendant and crediting the Defendant's facts as true.  Viewed in the light favorable to the Plaintiff and drawing inferences in her favor, the facts establish that the Defendant regarded the Plaintiff as having a disability that substantially limited her in her ability to work:

25

(1)    Plaintiff informed Cathy Vail and William Drohan, managers of DMG, on February 11, 2008, the date she received her diagnosis, that she had endometrial cancer, required surgery, that the surgery was set for March 5th and that she had to be on medical leave for approximately 3 weeks.

(2)    Drohan immediately inquired whether Plaintiff would require radiation and chemotherapy, and he then began interviewing applicants for the account executive position.

(3)    The following weekend Drohan met with Peter Doherty, interviewed him and made an employment offer to him for an Account Executive position which Drohan said was not then available.  Drohan also said he would be assigned to a difficult client (ECA, which was one of Plaintiff's clients).

(4)    Doherty accepted the position on February 19, 2008.

(5)    Two days later, a mere 10 days after she disclosed her medical condition and requested reasonable accommodation, Plaintiff was terminated.

(6)    Drohan discussed the termination in advance with Cathy Vail.  In the termination meeting, in response to an inquiry from the plaintiff as to unemployment benefits, Vail told her, if you can't work, you can't get unemployment.

26

The inference from the evidence is that DMG believed that the Plaintiff would have to undergo radiation and chemotherapy after her surgery, that Plaintiff would be substantially impaired over a long period for treatments for cancer and that the impairments would greatly interfere with Plaintiff's ability to work; that her condition and its treatments would cause the plaintiff to be unable to work for an extended period of time, a belief that is reflected in Vail's statement that "if you can't work you can't get unemployment." Drohan was so convinced that she would be unable to work that he recruited and hired another Account Executive to handle the ECA account and then terminated Plaintiff.

The evidence further establishes all the elements of the prima facie case of wrongful termination in violation of the ADA, as well as pretext.

The trial court further erred in granting summary judgment on the cause of action of retaliation for the Defendant on grounds that were not raised by the Defendant. The trial court failed to comply with Fed. R. Civ. P. 56(f) which requires notice and an opportunity to be heard. The trial court thereby denied Plaintiff a meaningful opportunity to present argument and evidence on that ground and denied her due process. The trial court erred in denying Plaintiff's Rule 59(e) motion. The evidence fully establishes the prima facie case for the cause of action of retaliation, along with pretext.

The trial court's judgment must be reversed.

27

# ARGUMENT

**Standard of Review**:

This court reviews <u>de novo</u> the trial court's grant of summary judgment.

<u>Gallagher v. Reliance Standard Life Ins. Co.</u>, 305 F.3d 264, 268 (4th Cir. 2002).

**Discussion of the Issues:**

## I.  THE TRIAL COURT ERRED IN ITS DECISION ON SUMMARY JUDGMENT BY DRAWING INFERENCES IN FAVOR OF DEFENDANT AND CREDITING FACTS FAVORABLE TO THE MOVING PARTY

Summary judgment cannot be granted unless there exist no facts in dispute and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56. The question at the summary judgment stage is not whether a jury is sure to find a verdict for the plaintiff; the question is whether a reasonable jury could rationally so find.  <u>See</u> <u>Gray v. Spillman</u>, 925 F.2d 90, 95 (4th Cir. 1991).

This ADA case alleged that the Defendant "regarded" the Plaintiff as disabled.  The trial court granted summary judgment to the Defendant, holding that the Plaintiff failed to establish a prong of the prima facie case, that she was regarded as disabled.  The trial court's judgment is clouded by the fact that the Plaintiff requested three weeks leave to have the surgery for the endometrial cancer – the "three weeks" is frequently referred to in the opinion.  But the evidence established that Plaintiff asked for three weeks leave because that was all

28

the leave that she had.  She told her doctor that she had three weeks leave, so she would ask for three weeks leave and plan to return to work thereafter.  JA 257.  The doctor advised a longer period. Id.  The trial court's judgment is further clouded by the defense argument that the Plaintiff was able to begin a job search within a month after the surgery.[16]  JA 45, 54-55.  But this is hindsight. At the time of the termination, no one knew how long recuperation would actually take, or whether the surgery would be successful, or whether the Plaintiff would require chemotherapy and/or radiation which are debilitating and frequently entail prolonged disability.

The trial court's judgment rests upon the drawing of inferences in favor of the Defendant.  Indeed, at the oral argument in this case, the Court argued inferences that it drew in favor of the Defendant.   JA 114, 115, 118-119, 121,

---

[16]      Congress intended persons with cancer to be covered individuals in the ADA, including under the "regarded as" prong, which it made clear with the passage of the Amendments to the ADA in 2008.  "Congress did not intend for the threshold question of disability to be used as a means of excluding individuals from coverage."  29 C.F.R. Part 1630 Intro., 76 Fed. Reg. 16978, 17004 (March 25, 2011), citing 2008 House Judiciary Committee Report at 5.  Indeed, in the ADAAA, Congress specifically rejected court interpretations of the regarded as prong in the ADA.  Pub. L. 110-325 Section 2(b)(3), September 25, 2008 (Congressional findings to reinstate the "broad view of the third prong of the definition of handicap under the Rehabilitation Act of 1973" in Nassau County v. Arline, 480 U.S. 273 (1987)).  Under current rules of interpretation, cancer, even when in remission, is a substantially limiting disability.  42 U.S.C. § 12102(4)(D); 29 C.F.R. § 1630.2(j)(1)(vii).

125, 131, 132, 133, 136, 139-140.    On a motion for summary judgment, a court is **not permitted to draw inferences in favor of the Defendant.**  The U.S. Supreme Court has repeatedly stated,

> [T]he nonmoving party's evidence "is to be believed, and **all justifiable inferences are to be drawn in [that party's] favor"** . .

Hunt v. Cromartie, 526 U.S. 541, 552 (1999) (error for the trial court to resolve racial discrimination issue by summary judgment; error to make credibility determinations and weigh the evidence, both of which are jury functions); see Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150 (2000) citing Anderson v. Liberty Lobby, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge").  A trial court commits error when it (1) credits the facts of the moving party over those of the non-moving party, and (2) fails to give the non-moving party the benefit of inferences due.

In rendering its decision in this case, the trial court ignored the warning of the Fourth Circuit that it is not a district court's "job" to the weigh the evidence or to disregard stories that the district court feels hard to believe; those are jury tasks. Gray v. Spillman, 925 F.2d 90, 95 (4th Cir. 1991).  In Rhoads v. FDIC, 257 F.3d

373, 394 (4th Cir. 2001), the Court of Appeals reversed and remanded a cause of

action for retaliation under the ADA because the trial court drew impermissible

inferences in favor of that Defendant.

> Though the district court was persuaded that no
> reasonable fact finder could conclude that Rhoads was
> the victim of retaliation, this conclusion was reached by
> improperly drawing inferences in favor of the FDIC. See,
> e.g., Rhoads, 956 F. Supp. at 1251 ("Jones, rather than
> harassing Rhoads, appears to have tried to accommodate
> [ ] her wishes and to have abstained from voting for her
> termination.  In those circumstances, there is a strong
> inference that Jones had no discriminatory animus
> against Rhoads.").  At the summary judgment stage, the
> evidence must be viewed in the light most favorable to
> Rhoads. . . Viewed in the proper light, the record
> establishes that once Rhoads failed to heed Jones'
> warning not to consult an attorney, she was terminated . . .
> Although Rhoads may not ultimately prevail on her
> retaliation claim, there is certainly sufficient evidence to
> overcome the FDIC's motion for summary judgment.

Rhoads, 257 F.3d at 394.

The question at the summary judgment stage is not whether a jury is sure to

find a verdict for the plaintiff; the question is whether a reasonable jury could

rationally so find.  Spillman, 925 F.2d at 95.  The question is further whether there

exist genuine disputed issues of fact on which a reasonable jury could rationally

find for the Plaintiff.  Yet, the trial court here based its conclusions on whether

evidence "necessarily shows," JA 112, what was argued by the Plaintiff – not

whether there exist genuine disputed issues of fact on which a jury could draw

inferences and render a verdict in favor of the plaintiff.  The trial court's opinion is filled with language indicating that it used a standard of certainty or "necessarily shows,"[17] e.g., that "do not reflect," "do not indicate," "do not suggest"  what was argued by the Plaintiff.  There is not a single discussion in the opinion of the disputed facts on the issues, of which there are many; there is not a single inference drawn in the Plaintiff's favor.

### A.    Faulty Conclusions of the Trial Court Favoring The Defense Require Reversal

The trial court's analysis and statement of facts pertinent to Count I, discriminatory discharge,  is filled with conclusions and inferences favoring the Defendant:

### 1.    "Plaintiff was terminated the day after she made an inappropriate statement to the president of one of DMG's clients . . ."  JA 153.

Although this statement could be read as a simple statement of dates - conference call on February 20 and termination on February 21, it implies a cause and effect.  Note the opinion does not state there exist disputes of fact on this issue.  The conclusion of the trial court as to cause can only be drawn by crediting facts favorable to the Defendant and drawing inferences favorable to the defense.

---

[17]    This is a standard far greater than preponderance of the evidence required in civil cases.

Actually, what occurred at the conference call[18] with the ECA Board is irrelevant, because the decision to terminate had been made <u>prior</u> to the time that meeting occurred.  Indeed, Cathy Vail, who attended the conference call, stated she took her 13 pages of notes in order to create a record for the future and kept them in case "we get to a place like this," i.e., litigation.[19]   Since she was already contemplating possible litigation and having documents with which to defend against it, the decision to terminate the Plaintiff had already been made.  Whatever happened in the conference call was irrelevant; DMG was going to create a pretext to use to try to justify termination regardless.

The inference from the evidence to be drawn in favor of the Plaintiff is that Mercer was terminated because she was regarded as having a substantially limiting disability.  The facts supporting this inference are:.

------

[18]    There are material disputes of fact as to what occurred in the conference call.  Vail testified that the Plaintiff yelled and was unprofessional, JA 409; Plaintiff testified that she was calm and professional but regretted a remark she had made JA 188, 277; Gilbert, a ECA Board member testified there was nothing unprofessional in the board meeting.  JA583, 581.

[19]    Drohan consulted with Vail in advance about terminating Plaintiff.  JA 357.

33

(1)    Plaintiff informed Cathy Vail and William Drohan, managers of DMG, that she had endometrial cancer, required surgery, that the surgery was set for March 5th and that she had to be on medical leave;

(2)    Drohan immediately inquired whether Plaintiff would require radiation and chemotherapy, and then within days began interviewing applicants for the account executive position, the position held by plaintiff;

(3)    The very following weekend Drohan met with Peter Doherty, interviewed him and made an employment offer to him for an Account Executive[20] position which Drohan said was not then available.  Drohan also said Doherty would be assigned to a difficult client (ECA, which was Plaintiff's main client);

(4)    Doherty accepted the position on February 19, 2008;

---

[20]    The position for which Doherty was hired is functionally equivalent to the Plaintiff's; it involved the same managerial and oversight responsibilities, same duties and same title.  See Gallo v. Prudential Residential Services, 22 F.3d 1219, 1225 (2d Cir. 1994) (holding that the plaintiff established a prima facie case where the employer reassigned almost all of plaintiff's duties to an employee outside of the plaintiff's protected class).

34

(5)    One day later, Vail attended the ECA conference call with the purpose of creating notes to create a record for the future, in case "we get to a situation like this" (litigation);

(6)    One day later, a mere 10 days after she disclosed the cancer and requested reasonable accommodation, Plaintiff was terminated for what DMG said was poor performance and client complaints, yet there existed nothing in writing to support the statement, no counseling of the Plaintiff, no disciplinary actions, and no prior notice to her of any performance deficiencies;

(7)    Moreover, two other Account Executives who handled the ECA account also had substantial difficulties with it, and the performance of one of them resulted in ECA (and 2 other clients) terminating its contract with DMG.  Yet DMG fired neither individual; neither had a serious medical condition; neither was regarded as disabled.

**2.    "Drohan's questions concerning chemotherapy and radiation do not support Mercer's argument that he regarded her as disabled."  JA 161.**

This is an inference from the evidence that the Court has drawn in favor of the Defendant.  The opposite inference can also be drawn that favors the Plaintiff, that upon learning of the endometrial cancer and need for surgery that Drohan

35

feared Mercer would also have to undergo chemotherapy and radiation[21] which are

debilitating, and that Mercer would be unable to work for a considerable period

because of the treatments.[22]  See Statement of Facts section 1.   The facts in the

following section also support this inference.

> ### 3. The hiring of Doherty was merely a "personnel plan regarding the ECA account that does not support a belief that Plaintiff would be significantly limited in her ability to work." JA 162.

Immediately after learning of Plaintiff's condition, Drohan began

interviewing for a new Account Executive.  The trial court states, "She [plaintiff]

acknowledged that [candidates for an account executive position] would be

interviewed even if she had stayed in her job." JA 156.  No such acknowledgment

was made.  Plaintiff testified that she knew candidates were being interviewed and

was told they were interviewing to be an Account Executive.  She stated only that

it was possible for such interviews to be conducted "if [Drohan] thought he was

getting some new clients in" but that she "was not aware of any new clients." JA

285.  In addition, Defendant produced no evidence that it brought in any new

---

[21]     The Court also states a defense-favorable and inaccurate view of the discussion between Mercer and Drohan when she informed him of her cancer condition.  The actual conversation between the parties is stated infra at Statement of Facts Section 1.a.

[22]     Drohan committed perjury in his depositions.  His testimony is not believable on any subject.

clients in that time frame or that the interviews were conducted for that purpose. Given the fact that Drohan committed perjury in his depositions and his credibility is suspect, see Statement of Facts section 4, the inferences drawn by the trial court favoring the defense are all the more surprising and troublesome.

The evidence does establish that Peter Doherty was hired before the Plaintiff was terminated, and before the ECA conference call, and that Doherty became responsible for the ECA account. The position for which Doherty was hired, had the same title as the Plaintiff's, Account Executive, and was functionally equivalent having the same duties.

The fact that Doherty was hired **one day before** the ECA conference call is significant. From that fact along with Vail's admission as to the purposes for which she took notes on the call, one can only conclude that Vail's participation in the conference call was a ruse and that what actually occurred in the conference call, purported "misconduct," had nothing to do with the termination. Vail knew before the call that the Plaintiff was being terminated. Yet, the trial court also concluded, again favoring the defense, "Ms. Vail also joined the meeting [ECA conference call] as she needed to familiarize herself with the ECA account so that she could assist the client during Ms. Mercer's absence." JA 156. This statement solely credits facts favorable to the defense, but completely ignores the actual testimony of Ms. Vail as to why she attended the meeting and took her 13 pages of

37

notes, i.e., to create a record for the future and kept them "in case we got to a situation like this" – litigation.  Viewed favorably to the Plaintiff as the court is required to do on summary judgment, Vail knew before the ECA conference call that the plaintiff was being terminated and participated on the call to try to find some wrongdoing upon which to base the termination.

Furthermore, it is illogical from a standpoint of management for an employer to hire a brand new person from outside the company to manage a major association conference that is to occur less than 2 months after the person's hire. A reasonable employer, if it truly believed an employee would be absent a mere three weeks for a medical condition, would be far more inclined to wait the three weeks (using persons such as Vail to fill in), and have the experienced employee manage the conference.

      **4.**    **Vail's statement in the termination meeting that if Mercer could not work she could not obtain unemployment insurance "did not necessarily show that Ms. Vail believed that Ms. Mercer's condition would affect her ability to perform in a similar position or a broad range of jobs."  JA 162.**

The trial court could not have drawn this conclusion without drawing inferences favorable to the defense.  Further, the burden of proof in civil litigation is not "necessarily show."

The inference from these facts to be drawn in favor of the Plaintiff is that Vail's statement that you "can't get unemployment if you can't work," reflects a belief that Mercer's condition would cause her to be unable to perform work in a broad range of jobs and for a considerable period of time. It is important to remember that Drohan told Vail in advance that Plaintiff was going to be terminated. They discussed it and Vail stated that Mercer was going to have surgery. JA 357. The inference from Vail's statement about unemployment is that DMG believed Plaintiff would be disabled for a long period. This inference is entirely consistent with Drohan's questioning about chemotherapy and radiation, and with Drohan hiring another Account Executive to replace Plaintiff on the ECA account.

In addition, Vail's statement was made in the presence of Bill Drohan in the termination meeting. Drohan did not contradict Vail or make any statements to mitigate the impact of Vail's statement. Drohan's silence is assent.

The trial court further erred in holding that Vail's statement could not be imputed to DMG because it is Drohan who made employment decisions at DMG. This is an example of the trial court considering a statement in a vacuum rather than considering the context in which the termination occurred. This statement by Vail is relevant to show intent to discriminate. Vail was the Director of

39

Operations at DMG, and her statement is a party admission that is admissible and relevant.   Fed. R. Evid. 801(d)(2).   The trial court erred in relying upon <u>Hill v. Lockheed Martin Logistics Mgmt</u>, 354 F.3d 277, 291 (4th Cir. 2004) for the proposition that an employer will be liable only for the actions of the person making the employment decision and not for any person who merely influences the decision.   This case is no longer good law for that proposition.[23]   Moreover, <u>Hill</u> has as no bearing on whether Vail's statement can be used as evidence of intent to discriminate by DMG.

Aside from the foregoing, the trial court further erred in concluding that Drohan's silent treatment of the Plaintiff could not be evidence supporting the cause of action based on regarded as disabled.   This is contrary to the conclusion of the Fourth Circuit in <u>Wilson v. Phoenix Specialty Manufacturing Company</u>, 513 F.3d 378, 381, 385 (4th Cir. 2008) (Wilson was "treated differently by senior management; the company vice president and immediate supervisor stopped his practice of joining Wilson on the loading dock for coffee and no longer met with and refused to look at him . . .  avoided Wilson whenever possible"; "this

---

[23]     The U.S. Supreme Court held to the contrary in <u>Staub v. Proctor Hospital</u>, 131 U.S. 1186, 1192 (2011) (USERRA case construing language similar to ADA and Title VII).  Liability can be had, even under the cat's paw theory, where a biased supervisor causes an unbiased higher-level supervisor to terminate the employee.  The bias of the lower-level supervisor can be imputed to the employer itself.

treatment shows the very myths and fears about disability and disease can result in a person being regarded as having a disability, one problem Congress was trying to address").

All of the above conclusions entered into the trial court's ultimate judgment that the Plaintiff has no evidence that DMG regarded her as disabled. If the facts favorable to the Plaintiff are given credit and inferences are drawn in her favor as required by the Supreme Court, the conclusion must be drawn that there exist disputed issues of fact for decision for a jury, and that a jury could reasonably render a verdict for the Plaintiff.

The trial court further erred in separating each fact presented by the Plaintiff and determining whether that single fact demonstrates evidence that Mercer was regarded as disabled. There is one adverse action here, the termination, and the court must consider all the facts leading to that termination and whether in the totality of the circumstances Plaintiff has met the requirements of the prima facie case and pretext. Thus, the statements made by Drohan and Vail must be taken in context with the fact that Drohan hired an Account Executive replacement for the ECA account, rather than considering each statement or act separately as the trial court did. The question is whether the facts taken together demonstrate that Plaintiff was regarded as disabled and discriminated against and retaliated against.

41

The question is whether the facts taken together show disputed issues of fact and that a jury could reasonably render a verdict for the Plaintiff. As an example see, Merritt, 601 F.3d at 295-296 where the court considered numerous facts set forth by the plaintiff and held "[e]specially in combination with Merritt's other evidence, these alleged facts suggest that perhaps Old Dominion's neutral reason was not its true reason but was a pretext for discrimination."

**B.    There Exist Material Facts in Dispute on the Cause of Action Of Wrongful Termination**

Count I alleges wrongful termination in violation of the ADA. The elements of the prima facie case of wrongful discharge are (1) she was a "qualified individual with a disability"; (2) she was discharged; (3) she was fulfilling her employer's legitimate expectations at the time of discharge; and (4) the circumstances of her discharge raise a reasonable inference of unlawful discrimination. Rohan v. Networks Presentations, LLC, 375 F.3d 266, 272 n.9 (4th Cir. 2004).

Where a case is based upon circumstantial evidence, the court's analysis is under the burden-shifting framework of Rohan v. Networks Presentations, LLC, 375 F.3d 266, 272 n.9 (4th Cir. 2004). The Plaintiff must prove the prima facie case by a preponderance of the evidence, and then the burden shifts to the defendant to produce evidence that would support a finding that unlawful

42

discrimination was not the cause of the employment action.  If the defendant

makes such a showing, the Plaintiff must produce evidence from which a jury

could conclude that an employer's proffered justification was false or other

evidence of discrimination.  The prima facie case combined with evidence that the

defendant's justification is unworthy of belief is sufficient to defeat summary

judgment.  <u>Reeves v. Sanderson Plumbing Prods. Inc.</u>, 530 U.S. 133 (2000).

However,

> Notwithstanding the intricacies of proof schemes, the
> core of every [discrimination] case remains the same,
> necessitating resolution of the "ultimate question of
> discrimination vel non. . . .  As the Supreme Court has
> explained, "[t]he ultimate question in every employment
> discrimination case involving a claim of disparate
> treatment is whether the plaintiff was the victim of
> intentional discrimination." . . .  Thus, "[c]ourts must . . .
> resist the temptation to become so entwined in the
> intricacies of the [McDonnell Douglas] proof scheme
> that they forget that the scheme exists solely to facilitate
> determination of 'the ultimate question of discrimination
> vel non.'" . . .
>
> By the time of appeal especially, the issue boils
> down to whether the plaintiff has presented a triable
> question of intentional discrimination and "the
> McDonnell Douglas framework – with its presumptions
> and burdens – is no longer relevant." . . .

<u>Merritt v. Old Dominion Freight Line, Inc.</u>, 601 F.3d 289, 294-295 (4th Cir. 2010)

(citations omitted).

43

### 1.    Mercer Fulfilled the Legitimate Expectations of the Employer

The evidence establishes that prior to the time Mercer informed her employer of her cancer condition, there existed no criticisms of her performance. The Defendant **admits** that it never reprimanded or disciplined the Plaintiff. To the contrary, the Plaintiff's performance was complimented. See Section 2, Statement of Facts.

Furthermore, testimony from Mercer's clients reflect that Mercer worked hard for the association clients, was easy to work with, was well respected and met their requirements. Even members of the Board of Directors of ECA testified that Mercer was professional, and performed well. <u>Id</u>.

The Defendant asserts there exist facts to support its allegation of poor performance. Thus there exist numerous facts in dispute as to the Plaintiff's performance, requiring the weighing of the evidence and decisions on whether and how much to credit the witnesses. Plaintiff has demonstrated that Drohan committed perjury, bringing his credibility into question as to all of his testimony. Statement of Facts Section 4. Thus, the weighing of the facts and credibility determinations must be left for decision by the jury.

This same evidence also raises the inference that the Defendant's justification for the Plaintiff's termination (poor performance) is a mere pretext for

44

disability discrimination.  Its excuse is not worthy of belief; nor is DMG's chief witness.  Evidence that a defendant's explanation for an employment practice is "unworthy of credence" is "one form of circumstantial evidence that is probative of intentional discrimination." <u>Reeves</u>, 530 U.S. at 147.  Although the evidence of pretext may be circumstantial, circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence."

## 2.    Mercer is a Qualified Person with A Disability

The facts, viewed in Plaintiff's favor as they are required to be on summary judgment proceedings, establish that the Defendant regarded the Plaintiff has having a substantially limiting disability.

To be a "qualified person with a disability" under the terms of the Act,  the Plaintiff need only satisfy one of three prongs stated in the definition of disability:

> (A)    a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
>
> (B)    a record of such an impairment; **or**
>
> (C)    being regarded as having such an impairment.

42 U.S.C. § 12102(2) (2008) (emphasis added).  See <u>Rohan v. Networks Presentations, LLC</u>, 375 F.3d 266, 273 (4th Cir. 2004).

A person is "regarded as disabled within the meaning of the ADA if a covered entity mistakenly believes that the person's actual, nonlimiting impairment substantially limits one or more major life activities." <u>Rohan</u>, 375 F.3d at 277, <u>quoting</u> <u>Murphy v. United Parcel Serv.</u>, 527 U.S. 516 (1999).

The evidence establishes that Plaintiff was regarded as having a substantial impairment of the major life activity of working: The facts establishing this element are set forth at Statement of Facts section 1, and will not be repeated here. Plaintiff has presented sufficient evidence to establish that there exists genuine disputed issues of material fact for trial.

### 3.    The Circumstances Establish Intentional Discrimination; DMG's Stated Reason for Termination Is a Pretext

As discussed above, the Defendant's proffered reason for termination is not worthy of belief and strains credulity.  The testimony of Drohan, who committed perjury, is suspect as to every issue.  The termination occurred within 10 days of the disclosure of Plaintiff's condition and request for leave.  Considering the statements made by Drohan and Vail, along with evidence of satisfactory performance until she announced her medical condition, the immediate hire of a replacement and Mercer's termination occurring 2 days after her replacement accepted the position, a jury could easily, and surely will, render a verdict in favor of the Plaintiff. Plaintiff's case is further supported by the fact that two other

46

Account Executives handled the ECA account: one was transferred from the account at ECA's request; the performance of the second was so poor that ECA (and 2 other clients) terminated its contract with DMG. Yet, neither individual was fired by DMG. <u>See</u> section 3.b., Statement of Facts. Neither had a serious medical condition; neither had requested leave as a reasonable accommodation.

<u>Summary</u>

The trial court erred in rendering summary judgment for the Defendant on Count I and erred in denying Plaintiff's Rule 59(e) motion on that cause of action. There is ample evidence to support the fact that the Plaintiff was regarded as disabled by the Defendant, and ample evidence to support the entire prima facie case and to establish pretext. There exist numerous genuine issues of material fact in dispute, and substantial evidence on which a jury could render a verdict for the Plaintiff. The trial court's judgment must be reversed.

**II.    CAUSE OF ACTION OF RETALIATION –
THE TRIAL COURT ERRED IN GRANTING SUMMARY
JUDGMENT ON GROUNDS THAT WERE NOT RAISED
BY THE DEFENDANT THEREBY DENYING
PLAINTIFF THE OPPORTUNITY TO BE HEARD**

The trial court entered summary judgment for the Defendant on Count II, Retaliation, holding that Plaintiff cannot establish that she engaged in a protected activity. JA 164. The Defendant did not argue this as a ground for summary

47

judgment or in its reply brief. JA 34, 92.   The Defendant did not include this among its affirmative defenses in its answer.  JA 26.  The Defendant did not pursue this defense as an issue in the case at any time and thus there was no discovery on whether the Plaintiff reasonably believed she was engaging in protected activity or other matters relevant to a court decision on this element of the prima facie case of retaliation in violation of the ADA.

Plaintiff filed a Rule 59(e) motion seeking amendment of the judgment in part because she was given no opportunity to be heard on this issue prior to the trial court rendering summary judgment on it; the trial court denied the motion in a one paragraph order.  JA168.

### A.    The Trial Court Erred in Denying the Plaintiff an Opportunity to Be Heard

On a motion for summary judgment, the moving party has the burden to raise legal arguments and facts to support dismissal, and the opposing party has the burden to counter those arguments with facts and law to demonstrate disputes of fact on material issues.  Fed. R. Civ. P. 56(a) provides:

> A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought. . . .

Based upon the submissions, the trial court makes a determination as to whether there exists genuine issues of material fact for trial. A district court may dispose of

a particular claim or defense by summary judgment when one of the parties is

entitled to judgment as a matter of law on that claim or defense.  Id.

If a trial court desires to consider summary judgment on a **ground not

raised by the parties**, the trial court is required by Rule to provide notice and an

opportunity to be heard:

> Judgment Independent of the Motion.  **After giving
> notice and a reasonable time to respond,** the court
> may:
>
> . . .  (2) grant the motion on grounds not
> raised by a party . . .

Fed. R Civ. P. 56(f) (emphasis added).  The trial court failed to follow this

mandate and thereby denied the Plaintiff due process.

Our adversarial system rests upon an independent and unbiased judiciary

making decisions, after the parties are provided a full opportunity to develop

evidence and to be heard in the trial court.  The Supreme Court has stated,

> . . .our procedural scheme contemplates that parties shall
> come to issue in the trial forum vested with authority to
> determine questions of fact. This is essential in order that
> parties may have the opportunity to offer all the evidence
> they believe relevant to the issues which the trial tribunal
> is alone competent to decide; it is equally essential in
> order that litigants may not be surprised on appeal by
> final decision there of issues upon which they have had
> no opportunity to introduce evidence.

Hormel v. Helvering, 312 US 552, 556 (1941).

49

In its brief on summary judgment, the Defendant conceded the prima facie case and directed its entire argument to pretext and its position that the Plaintiff was terminated for cause.  JA 57.  Defendant states only, "assuming arguendo that Mercer is entitled to the protection of the ADA . . ." id., and "Even if the plaintiff establishes a prima facie case of discrimination based on retaliation . . .".  JA 57.  Not another word is stated in the brief concerning the prima facie case of retaliation.  No claim is made whatsoever by Defendant that the Plaintiff's request for medical leave was not protected activity.  Defendant waived this defense.  See Bennet v. City of Holyoke, 362 F.3d 1 (1st Cir. 2004) (defense of notice requirement not raised pretrial at trial or motions; when a party sleeps on rights, waiver results); accord Ancel v. International, 170 F.3d 32, 35 (1st Cir. 1999) (waiver when defense not raised in pretrial papers or proceedings).

The trial court dismissed Plaintiff's retaliation cause of action based upon a ground never raised by the Defendant – based upon a defense that was conceded by the Defendant and upon which the Plaintiff never had a meaningful opportunity to be heard.   The trial court  abused its discretion and committed  clear error of law in doing so.

**B.    Sufficient Facts Are Produced to Support
a Prima Facie Case of Retaliation**

The elements of the prima facie case of retaliation under the ADA are (1)

that she engaged in a protective activity; (2) that she suffered an adverse

employment action at the hands of her employer; and (3) that a causal connection

existed between the protected activity and the adverse action. Rhoads v. FDIC,

257 F.3d 373, 382 (4th Cir. 2001), citing Haulbrook v. Michelin North America,

Inc., 252 F.3d 696, 705-07 (4th Cir. 2001). The trial court dismissed Plaintiff's

cause of action because she "cannot establish that she engaged in a protected

activity."  JA 164.

For a cause of action of retaliation, the Plaintiff need not have an actual

disability that a court finds to be valid, and need not raise a regarded as disabled

claim which the court finds valid.   This Court has unequivocally stated the "The

ADA retaliation claim . . . did not require proof of a disability."  Rhoads, 257 F.3d

at 380. This Court noted that the ADA retaliation provision states "no person shall

discriminate against any individual because such individual has" opposed activity

or participated in any manner under the ADA.   Id. at 391, quoting 42 U.S.C.

12203(a). "This prohibition includes retaliation against an individual who asserts

her right for reasonable accommodation of her disability even if the plaintiff is not

disabled pursuant to the ADA, but she has a good faith belief that the defendant's

51

conduct was unlawful under the ADA." Parada v. Banco Industrial de Venezuela,
2011 U.S. Dist. Lexis 14799 (S.D.N.Y. 2011). See also Krouse v. American
Sterilizer, 126 F.3d 494 (3d Cir. 1997) (a party alleging retaliation in violation of
the ADA need not be a qualified individual with a disability).

Thus, the trial court's analysis at JA 165, focused upon the "request for
three weeks accrued leave"[24] and based upon the trial court's conclusion that the
Plaintiff does not meet the definition of disability under the Act, is irrelevant
under prevailing law.

### 1.    The Court's Conclusions Contradict the Facts

Furthermore, the Court makes assumptions concerning an unrestricted right
to use leave that has accrued, and concludes without analysis, that use of such
leave cannot be characterized as a request for reasonable accommodation. JA 165.
As indicated earlier, the trial court's decision is clouded because the Plaintiff
asked for three weeks leave (the maximum amount that she had) even though the
doctor recommended more, and is clouded by Plaintiff beginning her job search
within a month of the surgery, when at the time of the surgery, no one knew how

---

[24]    As noted previously the trial court was very focused on the request
for "three weeks' leave."  But the evidence establishes that the only reason Mercer
asked for "three week" was because that was all the leave she had.  JA 257.
Furthermore, no one knew at the time of the termination how long the Plaintiff
would actually be disabled – that depended upon whether the surgery was
successful, or whether she required chemotherapy or radiation.

52

long the Plaintiff would be disabled, whether the surgery would be successful or

whether she would require radiation or chemotherapy.

The Court states that the employment contract imposed no restrictions on

the use of leave.  JA 165.  Actually, the employment agreement does not guarantee

any leave whatsoever.  The employment agreement merely states,

> 4.  Employment Benefits.  Benefits such as
> vacations, sick leave and insurance coverage, if any may
> be offered to employee at employer's sole discretion
> pursuant to the personnel manual as it may be revised by
> employer from time to time.

JA 196, par. 4.   The paragraph relied upon the trial court incorporated by reference

DMG's personnel manual.  The DMG Policy Manual 2005, JA 221-227, details the

requirements and procedures which an employee must follow to obtain consent in

advance for use of leave, which include, for an extended medical leave, one year of

service (which Mercer did not have), approval by DMG, and certification by a

health care provider for leave due to a serious illness.   Thus, the trial court's

assumption of an unfettered right to use accrued leave is contrary to fact.

### 2.     Requests for Medical Leave are a Request for Accommodation and are Protected Activity

Requests for reasonable accommodation constitute protected activity under

the ADA. See Jones v. United Parcel Serv., Inc., 502 F.3d 1176, 1194 (10th Cir.

2007).  See also 42 U.S.C. 12112(a) & (b)(5)(A).  In requesting accommodation,

the ADA does not require employees to "use the magic words 'accommodation' or even 'disability.'" Leeds v. Potter, 249 F. App'x 442, 449, 2007 U.S. App. Lexis 223517 (6th Cir. 2007) (unpub.).

Here, the trial court concluded that a "request for three weeks of accrued leave" to have surgery for endometrial cancer "was hardly a protected activity." JA 165. The trial court treated the matter as if it were a request for vacation instead of medical leave for surgery and treatment of a serious and often deadly cancer.

A request for the use of paid accrued leave or unpaid leave for medical purposes is a request for an accommodation under the ADA.[25] See 29 C.F.R. Pt. 1630.2(o) App. The First Circuit stated,

_____

[25]  A separate issue is whether the request is "reasonable," which requires consideration of the defense of undue hardship, 42 U.S.C. 12111(10). For example, a request for indefinite medical leave without any assurance that the employee will be able to fulfill her position's essential functions upon return is unreasonable, Myers v. Hose, 50 F.3d 278, 283 (4th Cir. 1995), as is a request for indefinite leave following a history of excessive absenteeism. Tyndall v. National Educ. Ctrs., 31 F.3d 209, 214 (4th Cir. 1994). See also Corder v. Lucent Techs., Inc., 162 F.3d 924 (7th Cir. 1998) (plaintiff had already received forty-three weeks leave in 1991, nineteen weeks in 1992, and nine weeks in 1993 before her termination); Duckett v. Dunlop Tire Corp., 120 F.3d 1222 (11th Cir. 1997) (plaintiff had received approximately ten months of leave prior to termination). Here there is no issue of an "indefinite" or very lengthy leave request.

> A request for reasonable accommodation of a disability constitutes protected activity under Section 503 of the ADA. Although a person making such a request might not literally "oppose" discrimination or "participate" in the administrative or judicial complaint process, s/he is protected against retaliation for making the request.  As one court stated:

> It would seem anomalous . . . to think Congress intended no retaliation protection for employees who request a reasonable accommodation unless they also file a formal charge.  This would leave employees unprotected if an employer granted the accommodation and shortly thereafter terminated the employee in retaliation.

Soileau v. Guilford of Maine, 105 F.3d 12, 16 (1st Cir. 1997).  See also

Haschmann v. Time Warner Entm't Co., 151 F.3d 591, 601-03 (7th Cir. 1998)

(holding that request for four weeks of medical leave was not unreasonable);

Rodgers v. Lehman, 869 F.2d 253, 259 (4th Cir. 1989) (holding  that alcoholic

employee should have been given the opportunity to participate in a rehabilitation

program using accrued or unpaid leave, and that the defendant's refusal to allow

plaintiff to use such leave was a violation of Rehabilitation Act); Fleck v. Wilmac

Corp., 25 Am. Disab. Cases (BNA) 1846 (E.D. Pa. 2011) (request for leave is

request for reasonable accommodation and protected activity); Baucom v. Potter,

225 F. Supp. 2d 585, 592 (D.Md. 2002) (plaintiff's request for 2-4 weeks of

medical leave for inpatient treatment not unreasonable); Garza v. Abbott

Laboratories, 940 F. Supp. 1227, 1294 (N.D. Ill.1996) (plaintiff engaged in statutorily protected expression by requesting accommodation for her disability).

This Court, and others, have also assumed, without deciding, that requests for medical leave are protected activities. See Williams v. Brunswick County Board, 2011 U.S. App. Lexis 15233, 25 Am. Disabilities Cases (BNA) 414 (4th Cir. 2011) (unpub.) (assuming without deciding a medical leave request is protected activity). Accord Garrett v. University of Alabama Birmingham Board of Trustees, 507 F.3d 1306, 1316 (11th Cir. 2007) ("We assume without so deciding, that Garrett's various requests for leave were protected activities"); Works v. Astrue, 2011 U.S. Dist. lexis 33152 *22 (D. Md. 2011) ("[R]equests for leave . . . may represent requests for reasonable accommodation and thus represent protected activity"); Matthews v. Village Center Community Development, 2006 U.S. Dist. Lexis 85906 (M.D. Fla. 2006) (request for part time status for limited period is protected activity); Bergin v. N. Clackaman School District, 2005 U.S. Dist. Lexis 42252 *68 (D. Or. 2005) (requests for leave to attend counseling appointments and request for FMLA leave are protected activity).

Based upon the law and the facts, Plaintiff engaged in protected activity when she requested leave to have surgery for endometrial cancer.

### 3. The Evidence Establishes the Causal Connection Between the Adverse Employment Action and the Request for Reasonable Accommodation

This Court has held that "[v]ery little evidence of a causal connection is required to establish a prima facie case [of retaliation]," <u>Tinsley v. First Union Nat'l Bank</u>, 155 F.3d 435, 443 (4th Cir. 1998) (overruled on other grounds). Temporal proximity between the protected activity and the employer's adverse action alone will suffice. <u>See</u> <u>Clark Cnty. Sch. Dist. v. Breeden</u>, 532 U.S. 268, 273, (2001); <u>accord</u> <u>Price v. Thompson</u>, 380 F.3d 209, 213 (4th Cir. 2004).

In <u>Rhoads</u>, the termination occurred within one month of the announcement that she had consulted with an attorney concerning her rights. <u>Rhoads v. FDIC</u>, 286 F. Supp. 532, 539, 540 (D. Md. 2003) (on remand). Here a mere 10 days passed between the request for reasonable accommodation and the termination. This evidence is sufficient to establish the causal connection.

### C. The Evidence Establishes Pretext

The facts here establish that the employer's proffered reason for termination, poor performance, is a pretext for retaliation for requesting reasonable accommodation. These facts merge with the prior discussion concerning the defendant's proffered reason in the context of the wrongful termination claim detailed above. Section I.B.3. infra. Plaintiff's evidence establishing the prima

57

facie case of retaliation, combined with the additional evidence tending to undermine the credibility of the defendant's proffered reason for termination is sufficient to defeat the motion for summary judgment.

## CONCLUSION

The trial court erred by entering judgment for the Defendant by drawing inferences in the Defendant's favor and crediting facts favorable to the Defendant. The trial court held the Plaintiff to a burden of proof greater than that required at trial in civil cases and greater than that required on motions for summary judgment, i.e., disputed issues of material fact.

The trial court further erred by rendering summary judgment for the Defendant on the cause of action of retaliation on grounds not raised by the defense.  It violated Rule 56(f) and denied Plaintiff due process by failing to provide her an opportunity to be heard on the element of the prima facie case of engaging in protected activity.

The trial court erred by denying Plaintiff's Rule 59(e) motion on both issues.  The trial court's judgment must be reversed and this case remanded for trial.

Respectfully submitted,

/s/ Patricia A. Smith
PATRICIA A. SMITH, Va. Bar 26090
LAW OFFICES OF PATRICIA A. SMITH
500 Montgomery Street, Suite 400
Alexandria, Va.  22314
(703) 548-3774
(703) 859-7640
E-mail: pasmithaty@aol.com
**Counsel Appellant Anne Mercer**

DALE EDWIN SANDERS, ESQ.
218 N. Lee Street
Alexandria, Va. 22314
(703) 837-1650
Fax: (703) 837-1620
email: dalesanders@sanders.org
Counsel for Appellant

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

`        This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

this brief contains <u>13,677</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

this brief has been prepared in a proportionally spaced typeface using <u>14 Point Times New Roman</u> in <u>WordPerfect 12</u>.

<table>
<tr><td></td><td>/s/ Patricia A. Smith</td></tr>
<tr><td>Dated: May 14, 2012</td><td>Patricia A. Smith</td></tr>
</table>

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on May 14, 2012, I electronically filed the foregoing

brief with the Clerk of Court using the CM/ECF System, which will send notice of

such filing to the following registered CM/ECF users:

> David D. Hudgins
> Juliane C. Miller
> **HUDGINS LAW FIRM**
> 515 King Street, Suite 400
> Alexandria, VA  22314
> (703) 739-3300
>
> *Counsel for Appellee*

The necessary filing and service were performed in accordance with the

instructions given to me by counsel in this case.

> /s/ Melissa A. Dockery
> Melissa A. Dockery
> Gibson Moore Appellate Services, LLC
> 421 East Franklin Street, Suite 230
> Richmond, VA 23219